E-FILED
Friday, 02 July, 2010  11:07:18 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ESTATE OF AUSTIN L. WELLS, Deceased, by JERRY WELLS, Administrator, JERRY WELLS and MINDY DAVIS, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 08-1128 |
| BUREAU COUNTY, SHERIFF JOHN D. THOMPSON, CORRECTIONS OFFICER SHERRY KEEFER, AND CORRECTIONS OFFICER CHRIS SPIEGEL, | ) ) ) ) ) | |
| Defendants. | ) | |

## O R D E R

This matter is now before the Court on Defendant's Motion for Summary Judgment. For the reasons set forth below, the Motion [#28] is GRANTED IN PART and DENIED IN PART.

### JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the Complaint alleges claims pursuant to 42 U.S.C. § 1983, the Americans With Disabilities Act, 42 U.S.C. § 12131, et seq., and Section 504 of the 1973 Rehabilitation Act, 29 U.S.C. § 794.

### BACKGROUND

Austin Wells ("Wells") was a 17-year old who lived with his father, stepmother, and brother in Dover, Illinois. He also worked for his parents at their business, Cranford Sign and Lighting Company. On June 4, 2007, Wells was arrested and taken to the Bureau County Jail (the "Jail"), where he committed suicide on June 9, 2007.

Back on May 18, 2007, the Bureau County Sheriff's dispatcher received a report from Wells' girlfriend, Julia Eickmeier ("Eickmeier"), indicating that Wells was missing and had made statements about killing himself.  Sheriff's deputies searched for him, but were unable to find him until the next day.  He denied having contemplated suicide and was examined by a physician who found him to be normal and not suicidal at that time based on his denials.  Following this incident, Wells returned home with his father.

On June 2, 2007, Wells was taken into custody at the Jail after being arrested by Deputy Sheriff Trey Barker on charges of illegal consumption of alcohol by a minor and possession of drug paraphernalia.  He was processed by Officer James Todd ("Todd").  During the intake screening, Todd entered a response of "no" to all of the screening questions.  Wells posted a $100 bail bond and was released that same day.  Two days later, on June 4, 2007, Wells was arrested by Officer Rick Taylor of the Princeton Police Department on charges of contributing to the delinquency of a minor and brought to the Jail.

During 2007, Sergeant Bill Redshaw ("Redshaw") was the Jail Superintendent and Defendant John E. Thompson was the Bureau County Sheriff.  The Jail operated on two daily shifts: the day shift was from 5 AM to 5 PM; the night shift was from 5 PM to 5 AM.  One correctional officer was on duty in the Jail during each shift.  Additionally, on some days, there was an additional officer working a cover shift from 11 AM to 11 PM.  Five correctional officers were on duty in the Jail at various times during the period Wells was in custody:

| Monday, June 4 | 11 AM - 11 PM | Chris Spiegel |
| | 5 PM - 5 AM | Sherry Keefer |

| | | |
|---|---|---|
| Tuesday, June 5 | 5 AM - 5 PM | Patrick Beaber |
| | 11 AM - 11 PM | Chris Spiegel |
| | 5 PM - 5 AM | Sherry Keefer |
| Wednesday, June 6 | 5 AM - 8 PM | Amy Rodda |
| | 5 PM - 5 AM | James Todd |
| Thursday, June 7 | 5 AM - 5 AM | Amy Rodda |
| Friday, June 8 | 5 AM - 5 PM | Patrick Beaber |
| | 11AM - 11 PM | Chris Spiegel |
| | 5 PM - 5 AM | Sherry Keefer |
| Saturday, June 9 | 5 AM - 5 PM | Patrick Beaber |

Since 2003, the Jail utilized a computerized intake ("booking") process in order to establish a record of background information with respect to each arrestee being received into custody. When this system was installed, a representative of the company that installed the program conducted a one-day training course on the use and operation of the program for all correctional officers employed at that time.

According to Defendants, the Jail's intake process involved the intake officer doing a physical assessment of every incoming arrestee by (a) observing the arrestee for any obvious injuries or illness requiring immediate emergency medical care; (b) determining by questioning whether the arrestee had a medical condition, such as diabetes or epilepsy, which would require medical attention during custody; and (c) determining through observation and questioning whether the arrestee might present mental health problems or a risk of self harm. The intake officer would record his observations and the answers to the screening questions in the booking computer.

The program requires the intake officer to enter information including background information on the arrestee, the nature of the arrest, fingerprints and photographs of the arrestee, a medical history, and a mental health/suicide screening. As questions appear

on the computer, the intake officer must type the responses on a keyboard.  There are certain questions where a "yes" response will provide an opportunity to type in an explanation.  There are also certain questions where a "yes" response triggers the instructions: "If yes, notify the OIC [officer in charge] desk."  Defendants assert that whenever there was a "yes" answer to one of those questions, the policy and practice at the Jail was that the intake officer was to ask the arrestee for an explanation of the answer and to notify Redshaw, or in his absence, the senior Sheriff's deputy on duty; there is some evidence suggesting that this "policy" was not widely understood or followed.  If an arrestee had previously been booked into the Jail, entry of the name into the computer will bring up background information from the most recent intake on the computer screen.  Following the entry of this information, the arrestee is fingerprinted and photographed.  The computer then prints out an Adult Arrest Report, a Property Sheet, an Arrest Card, and a Fingerprint Card for the arrestee's jail file.  Plaintiffs note that there was no written policy or procedure for the intake process at that time.

On June 4, 2007, Defendants Officer Sherry Keefer ("Keefer") and Officer Chris Spiegel ("Spiegel") handled Wells' intake process.  Keefer created an intake record for him by entering information into the Jail's computerized intake program.  Both Keefer and Spiegel testified that they did not recognize Wells at that time, know anything about him, his criminal history, or his arrest record.  Keefer does not remember the actual booking process with Wells other than that nothing stuck out to her,  but admits that she determined that he had a prior arrest because his name was already in the computer when she started the booking process, and she was able to clone his personal information from the prior

record.[1]  Spiegel claims that Wells appeared to be a normal teenage boy, with nothing

unusual about him or his demeanor.  Plaintiffs contend that this belief was not reasonable

under the circumstances.

Correctional officers have access to an arrestee's history of prior contacts with the

Sheriff's Department.  Neither Keefer nor Spiegel looked this up with respect to Wells on

June 4, 2007.  Nor did Keefer note the dates of his prior arrest or the reasons for the arrest.

Correctional officers cannot access the arrest reports and other incident reports generated

by the law enforcement division of the Sheriff's Department on the Jail computer.

Although she does not remember the actual booking process with Wells, Keefer's

normal  practice  when  doing  intake  processing  was  to  ask  the  arrestee  the  medical

---

[1]  In her deposition, Keefer stated that she did not remember the actual booking process of Wells, other than that she remembered booking him through and that nothing stuck out about him or she would have remembered it.  (Keefer Dep. at 87-90).  In her Affidavit submitted in support of the Motion for Summary Judgment, Keefer now provides extensive detail about the booking process, her actions, and Wells' responses. The Seventh Circuit is highly critical of this kind of effort "to patch up a party's deposition with his or her own subsequent affidavit."  Russell v. Acme-Evans Co., 51 F.3d 64, 67 (7th Cir. 1995) (internal citations omitted).  See also Essick v. Yellow Freight Systems, Inc., 965 F.2d 334, 335 (7th Cir. 1992) (finding that "a 'party should not be allowed to create issues of credibility by contradicting his own earlier testimony'") (internal citations omitted).  With this in mind, the Seventh Circuit has directed that "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." Russell, 51 F.3d at 67-68, citing Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1297 (7th Cir. 1993); Adelman-Tremblay v. Jewel Cos., 859 F.2d 517, 520-21 (7th Cir. 1988); Babrocky v. Jewel Food Co., 773 F.2d 857, 861-62 (7th Cir. 1985).  Here, there is no reasonable basis to conclude that the answers given during the deposition were mistaken.  The questions asked were clear, as were the answers given by Keefer.  There is no indication as to any lapse of memory by Keefer or indication that some subsequent event has refreshed her memory between the August 12, 2009, deposition and the preparation of her Affidavit on March 17, 2010. Accordingly, the Court will disregard the portions of her Affidavit stating specific details as to the booking process that contradict her assertions in her deposition that she really doesn't remember anything other than what has been previously stated.

screening questions just as they were worded on the computer monitor.  The first two questions on the medical screening ask about information provided to the intake officer by the arresting officer.  Keefer does not recall if she received any information from the arresting officer, but entered the answer "no" to questions about whether he had displayed any suicidal signs or symptoms to the arresting officer or whether the arresting officer had noted any health problems.  Keefer answered "no" to each of the questions directed to Wells' medical history and observations of any visible injury or trauma.  Keefer answered "yes" to the question about whether Wells lacked close family and friends in the community, but otherwise answered questions about him and his family with a response of "no."  Keefer and Spiegel claim to have been unaware that Wells' "yes" answer was incorrect, despite the fact that it contradicted other information on the booking form.  Keefer also answered "no" to questions regarding whether she observed Wells showing signs of depression, appearing overly anxious, afraid or angry, appearing unusually embarrassed or ashamed, acting or talking in a strange manner, being under the influence of alcohol or drugs, and showing signs of withdrawal or mental illness.

Defendants assert that when an arrestee answers "yes" to medical screening questions relating to injury or illness, medication, and/or suicide risk, the intake officer prints out a Medical Sheet providing a summary of the information and writes the arrestee's explanations for the "yes" answers on the sheet.  Keefer did not print out a Medical Sheet for Wells on June 4, 2007.

Wells was charged with contributing to the delinquency of a minor.  The statutory bond on that charge was $100.  After completing the intake process, Spiegel and Keefer escorted Wells to Cellblock 2 in the Jail, which was used to house male detainees in

general custody.  The cellblock consists of four two-bed cells, a dayroom, and a guard walkway.  Keefer explained the rules of the Jail to him as they walked.  Wells knew another detainee in Cellblock 2 and chose to share a cell with him.  After this detainee was moved out of Cellblock 2 on June 8, 2007, Wells did not have a cellmate.

Spiegel was on duty from 11AM to 11PM on June 4, 5, 8, and 9, 2007.  On June 4, 5, and 8, Spiegel observed Wells during cell checks talking, playing cards, or using the collect-call telephone repeatedly to ask people to help him come up with the bond money that he needed to get out of jail. Keefer recalls observing Wells in Cellblock 2 playing cards or arguing on the phone.   Beaber said that nothing stuck out about Wells and only recalls speaking with Wells once about a legal question about court between 4:30 and 5:00 PM on the last day Wells was alive.  On June 8, Wells got a tuberculosis test from the jail nurse and gave Spiegel a commissary order for free toiletries.

From 10 PM to 6:30 AM, detainees are locked in their cells.  During the overnight period from 11 PM on June 8, 2007, to 5 AM on June 9, 2007, Keefer did eleven cell checks on Cellblock 2.  While standing in the guard walkway, officers are able to look into two of the four cells and observe detainees in those cells, but officers are unable to see the detainees in the other two cells in the cellblock.  During her checks, Keefer personally observed the detainees in two of the cells in Cellblock 2 because she could see them from the guard walkway, but did not observe Wells in his cell because she was unable to see into his cell from the guard walkway.  At 6:45 AM on Saturday, June 9, 2007, when Beaber let the detainees in Cellblock 2 out of their cells for breakfast, he discovered Wells hanging in his cell.

On June 4, 2008, Plaintiffs brought this action alleging claims under § 1983 for violation of Wells' civil rights while in custody, Title II of the ADA for failing to modify the jail facilities, operations, and programs to reasonably accommodate Wells' mental disabilities, Monell claims against Sheriff Thompson and Bureau County for maintaining policies and practices at the Jail that were deliberately indifferent to Wells' rights, and state law claims under the Illinois Wrongful Death Act, 740 ILCS 180/2, Illinois common law, and the Illinois Local Government and Local Governmental Employees Tort Immunity Act, 745 ILCS 10/9-102.  Defendants have now moved for summary judgment.  The matter is fully briefed, and this Order follows.

## DISCUSSION

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact.  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

I.    Section 1983

Defendants first argue that Plaintiff's have not met their burden of demonstrating that Defendants violated Wells' constitutional right to receive necessary mental health care or be protected from self-harm. Section 1983 imposes liability where a defendant acts under color of a state law and the defendant's conduct violated the plaintiff's rights under the Constitution or laws of the United States. 42 U.S.C. § 1983. To establish a cause of action under § 1983, the plaintiff must allege: (1) that the defendant has deprived him of a federal right, and (2) that the defendant acted under color of state law. Gomez v. Toledo, 446 U.S. 635, 640 (1980). It is undisputed that Defendants were acting in their capacities as state actors and therefore the only remaining issue is whether Plaintiffs have adequately presented proof of a deprivation of a constitutional right.

The Eighth Amendment, applicable to the states via the Fourteenth Amendment, prohibits "deliberate indifference to serious medical needs" of a prisoner. Oliver v. Deen, 77 F.3d 156, 159 (7th Cir. 1996) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). However, as the Eighth Amendment does not apply to pretrial detainees like Wells, the

Court must apply a standard derived from Fourteenth Amendment due process considerations. Antonelli v. Sheahan, 81 F.3d 1422, 1427 (7th Cir. 1996); Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001). Nevertheless, "[b]oth the Eighth Amendment and this limited form of substantive due process require the state to provide to detained, committed, or incarcerated persons minimum levels of the basic human necessities: food, clothing, shelter, medical care, and reasonable safety." Collignon v. Milwaukee County, 163 F.3d 982, 988 (7th Cir. 1998), *citing* Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970 (1994); DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 195, 109 S.Ct. 998 (1989). Accordingly, courts have applied generally the same deliberate indifference standard under the Fourteenth Amendment as is applied under the Eighth Amendment. Mathis v. Fairman, 120 F.3d 88, 91 (7th Cir. 1997); Collignon, 163 F.3d at 988.

Pretrial detainees have a right to receive reasonable medical treatment for a serious injury or medical need, including mental health needs. Chapman, 241 F.3d at 845; Sanville v. McCaugherty, 266 F.3d 724, 734 (7th Cir. 2001). Thus, a prisoner alleging a denial of medical care by correctional officers must demonstrate both that his medical condition was objectively serious and that the prison "officials act[ed] with a sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991); Chapman, 241 F.3d at 845; Collignon, 163 F.3d at 988-89. A prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" in order to state a claim for denial of medical care under § 1983. Chapman, 241 F.3d at 845; Senisais v. Fitzgerald, 940 F. Supp. 196, 198 (N.D. Ill. 1996) (citing Estelle, 429 U.S. at 106).

A "serious" medical need is one that has been diagnosed by a physician or other healthcare professional as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997).  Such a need extends to medical conditions in which "denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose."  Id. at 1371.  Indications of serious medical needs include the existence of an injury that a doctor or patient would find worthy of comment or treatment, a medical condition that has a significant affect on an inmate's daily activities, or the existence of "chronic and substantial pain."  Id. at 1373.

A prisoner alleging that prison officials wrongfully denied him access to necessary medical care must also demonstrate that those officials actually wished him harm or were at least totally unconcerned with his welfare.  Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992).  In order to demonstrate the requisite subjective intent, the prisoner must prove that the official was deliberately indifferent to his medical needs.  Farmer, 511 U.S. at 835.  The deliberate indifference standard is satisfied when a prison official "fail[s] to act despite his knowledge of a substantial risk of serious harm" to a prisoner.  Id. at 842.  The official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  Mere negligence or even gross negligence related to medical problems is not enough to establish a constitutional violation.  Estelle, 429 U.S. at 105-06.  Rather, the act or omission must result in the prisoner being denied "the minimal civilized measure of life's necessities."  Farmer, 511 U.S. at 834; Gutierrez, 111 F.3d at 1369.

Defendants contend that Wells did not present a serious need for mental health care, as he had not previously received mental health care and did not identify it as a medical need at booking or at any subsequent time prior to his death.   Additionally, Defendants emphasize that Wells was examined by a doctor at the hospital emergency room on May 18, 2007, and determined to not be in need of examination by a mental health professional.   With all due respect, the fact that Wells did not need a mental health professional on May 18, 2007, is not dispositive of whether he presented a serious need on June 4, 2007.  Furthermore, this argument has been summarily rejected by the Seventh Circuit, which has held that in prison suicide cases, the objective element is satisfied by virtue of the suicide itself, as "it goes without saying that suicide is a serious harm."  Minix v. Canarecci, 597 F.3d 824, 831 (7th Cir. 2010), citing Collins v. Seeman, 462 F.3d 757, 760 (7th Cir. 2006); Sanville v. McCaughtry, 266 F.3d 724, 733 (7th Cir. 2001).

In a case like this, the deliberate indifference element requires a dual showing that the defendant: "(1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk."  Minix, 597 F.3d at 831, citing Collins, 462 F.3d at 761.  In other words, the defendant "must be aware of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing the act."  Id., citing Estate of Novack ex rel. Turbin v. County of Wood, 226 F.3d 525, 529 (7th Cir. 2000).

For the subjective knowledge component, "'it is not enough that there was a danger of which a prison official should have been aware,' rather, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Collins, 462 F.3d at 761, citing Estate of

Novack, 226 F.3d at 529.  Here, Defendants have testified that they were not aware that any of Wells' answers to the booking questionnaire were incorrect or that he had threatened suicide on a previous occasion.  Plaintiffs attempt to dispute these assertions by citing to Keefer's admission that she heard from other officers that Wells was upset about his girlfriend and had attempted suicide in the past.  However, the cited portions of Keefer's deposition make clear that she did not receive this information until after Wells had committed suicide.  (Keefer Dep. at 101, 117)

Plaintiffs likewise assert that the arresting officer or one of the other road deputies told Spiegel that Wells had been kicked out of his dad's house, was living in a tent, and that he and his girlfriend had a suicide pact.  Plaintiffs also state that the Sheriff's Department knew Wells and that Spiegel knew that officers were out looking for him on June 4.  Again, Plaintiffs ignore the fact that the deposition testimony cited clearly indicates that Spiegel had this conversation after Wells died.  (Spiegel Dep. at 76-77, 98-100) Like the above referenced testimony with respect to Keefer's knowledge, after-acquired information is simply irrelevant to establishing what was in their minds at the time they are alleged to have been deliberately indifferent to the risk that Wells would commit suicide.  *See* Collignon, 163 F.3d at 989 (noting that hindsight is not the measure of a defendant's conduct in a claim for deliberate indifference.)

Plaintiffs similarly attempt to dispute Defendants' testimony that they did not know that Wells had been reported missing and possibly suicidal by stating that any jail officer had access to this information.  In support of this attempt, Plaintiffs cite the deposition testimony of Officer Todd.  This testimony does not establish or even promote a reasonable inference that any Defendant actually went to the separate computer in another part of the

Sheriff's Office and looked up Wells' history and reports.  (Todd Dep. at 24, 28)  At best, it indicates that an officer could go look up such information and that Officer Todd had done it occasionally if he needed information to complete a report.

Plaintiffs cite evidence in the record indicating that the other inmates in the Jail knew that Wells was upset about his bond and not being able to see his girlfriend and had made the comment that "if he was going to go to prison, he would shoot himself" and that he was "going to make Princeton history."  (Defendants' Ex. 26 at 100007-100008) Yet once again, the evidence cited by Plaintiffs in support of these facts clearly indicates that these inmates did not provide Jail staff with any of this information until after being interviewed as part of the investigation of Wells' suicide.   There is therefore no basis for finding that this information was known to any of the Defendants prior to the suicide.

When viewed in the light most favorable to Plaintiffs, they have introduced evidence indicating that Keefer and Spiegel were both involved in Wells' intake process, but did not check his prior contacts history to see that he had been arrested earlier in the week or had been evaluated for the possibility of suicidal tendencies within the past month.  Although the record indicates that Wells responded negatively to questions regarding psychiatric history, thoughts of killing himself, and prior suicide attempts, he did provide a conflicting response when he answered that he lacked close friends or family in the area despite confirming that he lived and worked with his family just miles away.  According to the directions on the Jail's medical intake form, this answer directed that Keefer and Spiegel technically should have placed Wells in mental high risk status, notified the officer in charge, and placed him on constant supervision until transport.  There is nothing in the

record indicating that any effort was made to comply with these directions or to otherwise follow-up with the conflict in the information provided by Wells in this regard.

During the time he was on duty at the jail between June 4 and June 7, Spiegel heard Wells on the phone six to eight times pleading for someone to bond him out.  (Spiegel Dep. at 119-21, 124)  Keefer also heard Wells arguing and upset on the phone because he wanted out of jail and "they wouldn't come and get him."  (Keefer Dep. at 96-99)

Janet Eickmeier, the mother of Wells' girlfriend, Julia, met with Princeton Police Officers twice on June 4, 2007, after her 15-year-old daughter could not be located. (Eickmeier Dec. at ¶¶ 2-5)  The Princeton Police Department Case Report reflects this conversation as Eickmeier stating that she believed that her daughter was with Wells and that they "would be the type who would think that committing suicide together would be romantic."  (Plt. Ex. 1 at BC 88)  The record indicates that this report was prepared by officers from the Princeton Police Department, and there is no indication that it was communicated to the Sheriff's Office prior to Wells' suicide.

Janet Eickmeier has also stated that on June 4, 2007, when she went to pick Julia up after she and Wells were brought to the Jail, Eickmeier observed her daughter express that she did not want to leave because of her concerns that Wells would kill himself where Officer Richard Taylor, another Princeton Police Officer, a Youth Services worker, and at least three employees of the Bureau County Sheriff's Department "were present and in a position to hear her concerns."  The record does not identify who these representatives of the Sheriff's Department were or whether any of the Defendants were among them.  She also asserts that Sheriff Thompson was "present" when these concerns were raised, but does not specify whether Sheriff Thompson was also in a position to hear the concerns.

Jail policy is that after a detainee has a court appearance, the escort officer advises corrections about what happened in court, such as any changes in bond, etc.  On June 6, 2007, Wells went to court, where his bond was doubled and an order was entered prohibiting him from having any contact with Julia Eickmeier during the pendency of the case.  Pursuant to policy, corrections staff at the Jail were presumably advised of these changes and provided with a copy of the court's order.  Inmates often become upset over what happened during a court appearance, and an officer may talk to them to see "whether they need to have a little better eye kept on them for a while until they figure out what's going on."  (Spiegel Dep. at 25-29) The record does not indicate that such a conversation happened in this case, with the possible exception of Wells speaking with Deputy Beaber sometime close to the end of his shift at 5 PM on June 8, 2007, and asking a legal question about court or bond to which Beaber provided an answer.

Jail policy also generally provides for compliance with County Jail Standards, which require that a correctional officer personally observe each detainee at least every 30 minutes.  However, there is evidence that this policy was not followed during the time in question, but rather was supplanted by Sheriff Thompson's order following an attempted escape in October 2006.  Sheriff Thompson directed that a correctional officer was not to enter the dayrooms in Cellblock 1 or 2 to personally observe the inmates in all four cells in the cellblock unless a back-up officer was present.  As two officers were rarely present during the overnight shift, officers did overnight cell checks from the guard walkway in the cellblock.[2]  While standing in the guard walkway, officers were only able to look into two of

---

[2]  There is evidence suggesting that some officers understood this to mean that they were not to go beyond the guard walkway area on the 5 PM to 5 AM shift.  (Todd Dep. at 65-66)

the four cells in the cellblock; they were unable to see the detainees in the two rear cells. During his detention at the Jail, Wells was housed in one of the rear cells that could not be observed from the guard walkway.  As a result, he was not personally observed by a correctional officer at any time during the overnight shifts during his detention.

Even when construed in the light most favorable to Plaintiffs, this record does not establish that any Defendant had actual knowledge of "the significant likelihood that [Wells] may imminently seek to take his own life" or even facts that would promote the inference of subjective awareness of such a substantial risk.  Collins, 462 F.3d at 761; Estate of Cole v. Fromm, 94 F.3d 254, 260 (7th Cir. 1996).  While the evidence clearly suggests that perhaps Defendants should have been aware of Wells' potential for distress, whether as a result of reviewing his prior records, asking follow-up questions with respect to inconsistencies, inquiring further of other officers as to the circumstances of his arrest, or receiving information passed along by employees of the Sheriff's Office who heard Julia Eickmeier express her concerns that Wells might harm himself, the fact that they "should have been aware" of Wells' risk of suicide amounts to negligence, but "is not enough to show the required, actual knowledge of serious harm" in light of the totality of the circumstances in this case.  Minix, 597 F.3d at 831-32.

When compared to other precedent in the Seventh Circuit, the failure of Plaintiffs to meet their burden of establishing deliberate indifference by any of the individual defendants is apparent.  In Collins, the inmate requested to see a crisis counselor and specifically told one correctional officer that he was "feeling suicidal."  462 F.3d at 759.  The inmate's claim to be feeling suicidal was apparently not passed on to other officers in the unit or the crisis counselor.  Id., at 759-60.  The inmate also had medical records indicating that he had

been consulting with the prison psychologists and reported feeling "scared, anxious, and depressed." Id., at 761. The Seventh Circuit found that the inmate's request to see the crisis counselor, standing alone, was not sufficient to place these officers on notice that the inmate posed a substantial and imminent risk of suicide. Id., at 761. Nor was the fact that the inmates medical records contained the above-mentioned information, as there was no evidence in the record revealing that the officers were aware of that information. Id.

In Minix, the booking officer noted that the inmate had self-inflicted scars on his arms and neck and, after interviewing him, discovered that he was a mental patient at the state hospital, had suicidal thoughts, was on medication to inhibit suicidal thoughts, and had attempted suicide a month earlier. 597 F.3d at 828. When interviewed by Lonz, an employee of the jail's contract mental health provider, the inmate denied having suicidal thoughts and appeared generally polite and cooperative; Lonz did not review the inmates medical chart or medications, speak with any jail personnel regarding his condition, or learn that he had been placed on suicide watch. Id. Based on this assessment, the nurse requested that the inmate be taken off suicide watch and returned to the general population. Id. A month later, the inmate refused his medications, and officers noticed a blade missing from his razor; the inmate was returned to medical segregation for a suicide watch. Id. After two days of observation finding the inmate to be alert, polite, and denying suicidal thoughts, the same nurse again recommended his transfer out of medical segregation. Id., at 829. That evening, the inmate hung himself. Id. The Seventh Circuit found that summary judgment was properly granted in favor of Lonz, as she had found him to be polite, cooperative, and denying any thoughts of suicide. Id., at 831. Despite the information in the inmates records, there was no evidence that Lonz was actually aware

of the inmates suicidal history or placement on suicide watch, and absent such knowledge, she could not have been deliberately indifferent to the risk.  Id.  The Court of Appeals further found a lack of actual knowledge that the inmate would "imminently seek to take his own life" by the nurse based on inmates denial of suicidal thoughts and lack of "strange behavior or any obvious signs that he was an imminent suicide risk."  Id., at 833.

In Collignon, the jail doctor knew that the inmate had a serious mental illness, was resistant to taking his medications, and posed some risk for suicide.  163 F.3d at 989-90.  The inmate was placed on the highest level of suicide watch at the jail.  Id., at 990.  The doctor's treatment with a non-therapeutic dose of an anti-psychotic drug that she knew would not have any effect on the inmate's schizophrenia was found not to be deliberately indifferent based on the doctor's lack of knowledge that the inmate was on the verge of committing suicide.  Id.  Similarly, allegations that officers who failed to review readily available records and incident reports concerning the inmate's extensive recent history of mental illness, suicide attempt, release from suicide watch that same day, and prior contacts with the police department despite desperate pleas from the inmate's parents that they retain custody of their son to obtain medical treatment for him were found not to be enough to sustain either a claim based on inadequate training or deliberate indifference.  Id., at 991-92.

In Estate of Novak v. County of Wood, 226 F.3d 525, 527-28 (7th Cir. 2000),  the inmate, who had been receiving treatment "as a paranoid schizophrenic who tended to be impulsive and who was a possible suicide risk," was arrested on outstanding warrants.  The transport officer talked to the inmate's mother and an employee of the local mental health center about the inmate's condition and assured them that he would notify the jail staff of

the inmate's potential for suicide and that the jail personnel would watch him closely.  Id., at 528.  Even though the transport officer did not observe any unusual behavior during the transport, this information was in fact passed on to jail personnel.  Id.  During the medical screening portion of the booking process, the inmate indicated that he had seen mental health professionals in the past, including a visit earlier in the week, but denied considering suicide or having ever attempted suicide.  Id.  Based on this information, as well as the information relayed by the transport officer, the inmate was placed in an observation cell.  Id.  The next day, jail officers were not informed of the reasons for the inmate's placement in the observation cell, and following a court appearance, the inmate was placed in a two-person cell in general population.  Id.  The following day, the inmate's mental health provider called the jail to prescribe new medication for him, and the prescription was filled and administered.  Id.  During the following two weeks, other inmates observed strange behavior by the inmate, including pounding on the cell walls and giggling uncontrollably and reported this behavior to jail staff.  Id.  Neither this strange behavior or any suicidal behavior was personally observed by jail staff.  Id., at 529-30.  None of this was found to be sufficient to place jail officials on notice that there was a significant likelihood that the inmate would attempt to harm himself, that jail staff were subjectively aware that the inmate posed a high risk of suicide, or that jail staff were deliberately indifferent to such a risk.  Id., at 530.

Finally, in Matos ex rel. Matos v. O'Sullivan, 335 F.3d 553, 554 (7th Cir. 2003), the inmate denied present suicidal ideation, hallucinations, any history of psychiatric treatment, and need for present mental health services on intake, and the intake officer observed no present evidence of major depression or inappropriate mood or affect.  Later that day, the

inmate provided information to another prison employee on a "Reception and Periodic Medical History" form indicating that he had a history of psychological treatment, had suffered from manic depression-schizophrenia, had attempted suicide in the past, and was in urgent need of a mental health referral.  Id.  However, there was no evidence that the inmate suffered from any psychiatric or psychological problems during his initial term of imprisonment.  Id.  The inmate was placed on supervised release, violated the terms of his release, and returned to serve a violator term at the same facility approximately a year later.  Id., at 554-55.  Upon intake, the inmate provided information similar to the information provided on intake during his prior incarceration; no new "Reception and Periodic Medical History" form was filled out, and there is no evidence suggesting that any jail staff were aware of the information contained on the prior form.  Id., at 555.  The inmate was subsequently transferred to another facility, where he was evaluated by a staff psychologist after the death of his father.  Id.  The staff psychologist noted that the inmate denied any suicidal ideation, declined counseling, and indicated that he was depressed and frustrated over the death of his father but was not suicidal.  Id.  A few days later, the inmate asked to speak with a crisis team member regarding feelings of depression, frustration, and confusion related to the death of his father, and an officer responded within five minutes of receiving the request; the crisis team member's notes reflect that the inmate was having trouble coping with his loss, was very emotional but thought that he could resolve the problem, and did not feel that he wanted to hurt himself or others.  Id.  The inmate was evaluated again approximately two weeks later, and found to be lucid, alert, denying suicidal ideation, gave no indication of delusions or hallucinations, but admitted to feeling distressed over his father's death; the staff psychologist determined that no crisis watch

was necessary.  Id., at 556.  An expert witness for the inmate's family opined that "it was quite clear that [the inmate] was psychotically depressed and suicidal" and that he had "almost every single danger sign of a suicide risk."  Id.  The inmate's sister also stated that he had called her almost every day while in custody, was often crying, and at least once told her that he was thinking of committing suicide.  Id.  Again, the Seventh Circuit concluded that the plaintiff had not shown that any defendant had actual knowledge of the inmate's risk of suicide.  Id., at 557.

Contrast these decisions with Woodward v. Correctional Medical Services of Illinois, Inc., 368 F.3d 917 (7th Cir. 2004), where deliberate indifference was found to have been established.  In Woodward, the contracted intake screener specifically noted "yes" to whether the inmate had expressed thoughts of killing himself, as well as his history of psychiatric treatment and suicide attempts.  Id., at 923.  Despite this, she failed to note his risk of suicide in the summary section of the intake form, alter the jail's shift commander about his condition, or refer him for an immediate mental health evaluation.  Id.  It was seven days before the contract social worker evaluated the inmate, but even then, the social worker did not review his medical chart, the mental health intake screening form indicating his suicidal tendencies, his significant mental health history, or the numerous suicide attempts in his past.  Id., at 924.  The contract social worker was aware that someone in the jail had reported that the inmate expressed suicidal thoughts immediately prior to his evaluation.  Id.  He then completed a mental health intake evaluation in which he noted that the inmate had 10 prior psychiatric hospitalizations, the most recent of which followed a suicide attempt, had undergone outpatient mental health counseling, had a history of being prescribed psychotropic medications, was feeling depressed and not

himself, and "feels current suicidal proclivities." Id.  The social worker recommended that

the inmate be treated for depression and, pursuant to policy, should have ensured that the

inmate would be placed in an appropriate setting pending a psychiatric evaluation, but this

was not done. Id., at 924-25.  The inmate was not placed on suicide watch or housed in

a safe cell pending psychiatric evaluation and nothing was done to arrange for him to see

the psychiatrist for another seven days. Id., at 925.  The psychiatrist then noted that the

inmate was expressing "suicidal ideation" and concluded that the inmate posed a risk of

suicide, but did nothing to ensure that the inmate was put on suicide watch or to review

available records to determine his custody status. Id.  The psychiatrist prescribed

medication to treat the inmate's depression, but acknowledged that it would take several

days to a number of weeks to become effective. Id.  Two days later, the inmate was on

lockdown, appeared distraught and upset, and made repeated inquiries about being taken

off lockdown. Id.  The Seventh Circuit held:

> Had CMS ensured that its own written policies were followed,
> [the intake screener] would have notified the correction staff
> immediately that [the inmate] was suicidal and ensured that he
> was placed on suicide watch. [The inmate] would therefore
> have been physically checked on by correctional guards every
> 15 minutes.  Furthermore, [the social worker and psychiatrist]
> would have made certain that [the inmate] was put on such a
> watch.  If any had acted, [the inmate] would almost certainly
> not have been allowed to lie in his bed all day unchecked,
> making a noose out of a bed sheet.  He would, moreover, have
> been moved to a room without hooks on the wall.  Under its
> own written policies, furthermore, [the intake screener] would
> have made a "mental health referral ASAP."  There would not
> have been a delay before [the inmate] was ultimately seen by
> [the psychiatrist.]  At the very least, the medication [the
> psychiatrist] prescribed would have had a chance to take effect
> before [the inmate] took his own life.  The reality is that CMS's
> actual policy and practice caused its employees to be
> deliberately indifferent to [the inmate's] serious health needs.

Id., at 928.

Based on a review of this precedent, the Court finds that this case falls well within the parameters established by the cases holding that actual knowledge and deliberate indifference have not been established. The failure of the officers to conduct cell checks at 30 minute intervals as required by state policy, much less make any observation of Wells at any time between 10 PM lockdown and 6:45 AM is incomprehensible. However, § 1983 provides no remedy for failure to meet state law requirements in and of themselves. Estate of Novack, 226 F.3d at 532. Failure to review past records indicating that someone had expressed concern about the possibility of Wells committing suicide, observation of agitation or even what could be characterized as depression, repeated phone calls to family, and a 4-day period of pretrial detention without bond coupled with denials of suicidal intent, absence of past mental health treatment, suicide attempts, or diagnosis of psychosis, and the lack of observations of any strange, increasingly bizarre, erratic, or wild behavior does not rise to the level of proof necessary to demonstrate an actual, subjective knowledge that Wells posed a high risk of suicide or deliberate indifference to such a risk. See Matos, 335 F.3d at 558, citing Cavalieri v. Shepard, 321 F.3d 616, 621 (7th Cir. 2003) (noting the increased risk of suicide in prison inmates, yet concluding that "not every prisoner who shows signs of depression or exhibits strange behavior can or should be put on suicide watch.") Even assuming that any of the Defendants were among those present when Julia Eickmeier expressed her concern that Wells would harm himself on June 4, 2007, this does not alter the result. See Collignon, 163 F.3d at 991-92. Nor can the Court reasonably conclude that an inconsistent answer with respect to having close family in the area should have set off the same alarm bells as an admission of imminent suicidal intent,

particularly in light of testimony indicating that that particular question is ambiguously phrased and can be unintentionally answered incorrectly. (Redshaw Dep., at 32-34; Speigel Dep., at 72-74)

What happened to Wells was an undeniable tragedy, and were the Court addressing a case of simple negligence, the result would likely be different. That being said, this is a § 1983 claim, which requires the higher showing of deliberate indifference to a known risk to an inmate's safety while in custody. Plaintiffs simply have not demonstrated anything close to the kind of intentional disregard of a known risk that Wells would harm himself set forth in Woodward. Defendants Keefer and Spiegel are therefore entitled to summary judgment in their favor on Plaintiffs' § 1983 claim against them in their individual capacities.

The individual capacity claim against Sheriff Thompson requires further discussion. Sheriff Thompson seeks summary judgment for lack of personal involvement based upon the assertion that he did not even know Wells was at the jail at the time, much less that Wells posed any risk of danger to himself. Plaintiffs offer the statement of Janet Eickmeier that Sheriff Thompson was present when Julia Eickmeier expressed her concerns that Wells might harm himself. They further point to Sheriff Thompson's admission that he reviews all of the arrest and other reports prepared in the Jail as support for the inference that he was aware of the fact that Wells had been arrested three times in less than a month, with one incident based on a report that Wells was missing and suicidal. For the reasons set forth above with respect to Keefer and Spiegel, this evidence falls short of meeting the burden required to establish actual knowledge, the inference of subjective awareness of a substantial risk of serious harm, or deliberate indifference to such a risk.

- 25 -

Plaintiffs then cite <u>Armstrong v. Squadrito</u>, 152 F.3d 564, 581 (7th Cir. 1998), in support of their argument that Sheriff Thompson is individually liable because he "personally devised a deliberately indifferent policy that cause a constitutional injury." Specifically, they contend that Sheriff Thompson was personally responsible for the policies, procedures, training, and supervision of the jail, including the policy of directing that no personal observations would be made of inmates in cells such as the one occupied by Wells for periods in excess of eight hours.

The problem with this argument is that Sheriff Thompson is the final policymaker for the Jail.  As such, the policies that he makes as the Bureau County Sheriff are necessarily made in his official capacity.  Furthermore, the Seventh Circuit has held that the conduct of a sheriff who had at least constructive knowledge of a detainee's prolonged incarceration, established an allegedly unconstitutional policy that allowed the detainee to remain in custody for seven days without an initial hearing, and took no action to handle the problems caused by the policy "does not add up to the kind of personal involvement we require for individual liability in sec. 1983 cases."  <u>Luck v. Rovenstine</u>, 168 F.3d 323, 327 (7th Cir. 1999), *citing* <u>Gentry v. Duckworth</u>, 65 F.3d 555, 561 (7th Cir. 1995).  The record is devoid of evidence indicating that Sheriff Thompson had any direct contact with Wells or formulated any policy specifically to affect Wells, and the Court has found that the information known or readily knowable to Sheriff Thompson did not amount to a showing of his actual knowledge that Wells posed an imminent risk of harming himself under

Seventh Circuit precedent.  Accordingly, the Court concludes that Sheriff Thompson is also entitled to summary judgment on the individual capacity claim against him.[3]

That leaves Plaintiffs § 1983 claim against the County and Sheriff Thompson in his official capacity, or Monell claim, for injuries caused by policies that are alleged to be deliberately indifferent to Wells' safety.  Specifically, Plaintiffs challenge the following policies: (1) directing corrections officers to fail to personally observe detainees for lengthy periods of time exceeding seven to eight hours; (2) failure to identify, articulate, or enforce suicide prevention policies at the Jail; and (3) failure to train, supervise, and discipline officers on intake screening, monitoring detainees, and suicide prevention.

An official capacity claim against the Sheriff is essentially a claim against the governmental entity that he represents, which in this case is the Bureau County Sheriff's Office.  Brokaw v. Mercer County, 235 F.3d 1000, 1013 (7th Cir. 2000); Kentucky v. Graham, 473 U.S. 159 (1985).  Under Illinois law, the Sheriff is an independently elected constitutional officer.  Ill. Const. Art. VII, § 4(c); DeGenova v. Sheriff of DuPage County, 209 F.3d 973, 977 n.2 (7th Cir. 2000), citing Ryan v. County of DuPage, 45 F.3d 1090, 1092 (7th Cir. 1995).  That being said, the Sheriff "only has whatever funds the county chooses to give his office in any given year."  Carver v. Condie, 169 F.3d 469, 473 (7th Cir. 1999).  As a result, the county is a necessary party in any suit seeking damages against the Sheriff in his official capacity, and Bureau County's suggestion that it is not a proper party is mistaken.  Carver v. Sheriff of LaSalle County, 324 F.3d 947, 948 (7th Cir. 2003).

---

[3]  Given the status of the law set forth above, the Court cannot find that Defendants' conduct violated any of Wells' clearly established constitutional rights, and they would also be entitled to qualified immunity on the § 1983 claims against them in their individual capacities.

Under <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658, 98 S.Ct. 2018 (1978), and its progeny, a municipality may not be held liable for the acts of individual members of its police force solely on a theory of respondeat superior. <u>Gossmeyer v. McDonald, et al.</u>, 128 F.3d 481, 494 (7th Cir. 1997), *quoting* <u>Livadas v. Bradshaw</u>, 512 U.S. 107, 114 S.Ct. 2068 (1994); <u>Lanigan v. Village of East Hazel Crest, Illinois</u>, 110 F.3d 467, 478 (7th Cir. 1997), *citing* <u>Monell</u>, 98 S.Ct. at 2036. Rather, "a plaintiff must establish that the constitutional deprivation resulted from either an official policy of the municipality or from a governmental custom or usage, even if such custom was not formally approved by the municipality." <u>Sams v. City of Milwaukee, Wisconsin</u>, 117 F.3d 991, 994 (7th Cir. 1997), *citing* <u>Monell</u>, 98 S.Ct. at 2035-36. It must also be shown that the persistent or pervasive policy in question was the proximate cause of or moving force behind the alleged constitutional injury. <u>Sams</u>, 117 F.3d at 994; <u>Estate of Novack</u>, 226 F.3d at 530; <u>Cornfield by Lewis v. School District No. 230</u>, 991 F.2d 1316, 1324 (7th Cir. 1993).

A municipal entity can violate a detainee's constitutional rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." <u>Woodward</u>, 368 F.3d at 927, *citing* <u>Payne v. Churchich</u>, 161 F.3d 1030, 1043 (7th Cir. 1998); <u>Estate of Novack</u>, 226 F.3d at 530. Such a custom or policy can take one of three forms:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority.

Brokaw, 235 F.3d at 1013.  The plaintiff must show that the policymaker was "deliberately indifferent as to [the] known or obvious consequences."  Thomas v. Cook County Sheriff's Dept., 604 F.3d at 293, 303 (7th Cir. 2010), *citing* Gable v. City of Chicago, 296 F.3d 531, 537 (7th Cir. 2002). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." Id.

Plaintiffs first argue that Sheriff Thompson's policy that correctional officers not personally observe inmates during the overnight shift is constitutionally inadequate. Specifically, Plaintiffs maintain that despite Illinois Jail Standards requirement for personal observation of inmates at 30 minute intervals and repeated admonitions from the IDOC that the Jail failed to comply with these requirements, Sheriff Thompson implemented a policy instructing correctional officers not to conduct 30 minute observations of all detainees and went so far as to instruct that no personal observations of all detainees be conducted for more than eight hours at a time during the overnight shift.

Sheriff Thompson asserts that each correctional officer is required to be familiar with the Illinois County Jail Standards (the "ICJ Standards")and the Jail's policies and practices. It was Jail policy that the ICJ Standards were fully applicable to the Jail and were to be observed by all correctional officers.  The ICJ Standards include § 701.130(a)(2), which requires that a correctional officer personally observe each detainee at least every 30 minutes.  During daytime cell checks, this was done through personal observation of the detainee in the cellblock dayroom.  During the nighttime hours, when the detainees were locked down in their cells, this was historically done by the officer entering the cellblock

dayroom from the guard walkway and personally observing each detainee through the window in the detainee's cell door.

However, following an attempted escape on October 26, 2006, Sheriff Thompson ordered a change in this policy, instructing correctional officers to not enter the dayrooms in Cellblock 1 or Cellblock 2 unless a back-up officer was present.  Rather, officers would do checks from the guard walkway in the cellblock, looking into each cell visible from that position.  From the guard walkway, officers are only able to look into two of the four cells in the cellblock to observe detainees.  They are unable to see the detainees in the other two rear cells in the cellblock.  Due to funding limitations, there was normally only one correctional officer working the overnight shift during the time in question, resulting in cell checks being performed from the guard walkway and virtually no cell checks for detainees in the two rear cells of the cellblock for a period of more than six hours each night.  It is undisputed that this situation and policy existed from October 2006 through 2007.  It is further undisputed that because of Sheriff Thompson's policy revision, Wells was not personally observed during cell checks from at least 11 PM on June 8, 2007, to 5:00 AM on June 9, 2007, because he was in one of the rear cells that was not observable from the guard walkway.

While § 1983 provides no remedy for failure to meet state law requirements in and of themselves, that does not insulate the Sheriff's cell check policy from  scrutiny, as the directive to not check or observe inmates could be reasonably deemed a conscious disregard of an obvious danger without regard to the state requirements. Estate of Novack, 226 F.3d at 532; Armstrong, 152 F.3d at 577, *citing* Board of County Commissioners v. Brown, 520 U.S. 397 (1997).  To put it quite bluntly, a policy directing that some detainees

receive no personal observation for at least eight hours per day is unfathomable.  Even assuming the legitimacy of the Sheriff's stated reasons for implementing the policy, the danger posed by the lack of personal observation could have been avoided by simply assigning inmates to the front two cells in each cellblock that were directly observable from the guard walkway when there were four or less detainees in the cellblock, as was the case on the night Wells hung himself.

"As a population, prison inmates are around nine times more likely to commit suicide than free persons. . . ."  Matos, 335 F.3d at 558.  In fact, there were six reported suicide attempts between 2002, when Sheriff Thompson took office, and the death of Austin Wells in June 2007.  The 2005 IDOC inspection of the Jail concluded that the Jail was "non-secure and a security risk to detainee(s), staff and to the citizens at large."  (Plt. Ex. 16 at 100346)  Sheriff Thompson was advised that "[t]he violations can and should be addressed immediately" and that he was given a six month notice to correct the violations. Id.  Failure to comply with the notice by the end of the six-month period would result in the Attorney General's Office being notified as to the non-compliance.  Id.  The report from this inspection cited Sheriff Thompson, among other things, for violation of ICJ Standards, as the presence of "only one staff being on shift at times and the necessity to open cellblock doors to conduct proper cell checks."  (Plt. Ex. 16 at 100349)  The 2006 Inspection Addendum again noted  insufficient staffing practices, often leaving the Jail with only one correctional officer on duty for more than 12 hours per day, and advised that there was an insufficient number of officers present to provide supervision, personal observation, 30-minute cell checks, back-up when opening cell doors, etc.  (Plt. Ex. 17 at 100376-77)  The lack of sufficient correctional officers during the overnight shift was again noted in the

January 2007 Investigation Report following the attempted escape in October 2006, and a past detainee's suicide was also attributed to the staffing shortage.  (Plt. Ex. 18 at P356-57)  In March 2007, the IDOC stated that staffing shortages were found to have directly contributed to the escape attempt, as the Jail did not have sufficient back-up personnel present during the overnight shift.  (Plt. Ex. 19 at 100401)  While some of this evidence may be based in part on a violation of state regulations, it also evidences a safety risk posed by the complete failure to observe certain detainees for hours at a time when staffing was inadequate, and Sheriff Thompson's awareness of that risk.

The Court is unpersuaded by Defendants argument that there can be no official liability under Monell because none of its employees were found to have violated Wells' constitutional rights.  First, allegations that individual officers were deliberately indifferent are evaluated under a subjective awareness standard, while allegations that a municipality was deliberately indifferent are considered under an objective analysis.  Farmer, 511 U.S. at 841.  Second, the Seventh Circuit has held that "a municipality can be held liable under Monell, even when its officers are not, unless such a finding would create an inconsistent verdict."  Thomas, 604 F.3d at 305.  Here, it would not be unreasonable to conclude that the individual defendants were not deliberately indifferent to Wells' safety because they lacked actual knowledge of his imminent intent to harm himself and could not have responded differently because of Sheriff Thompson's policy directing that they not conduct personal observations of the rear cells during the overnight shift or at any other time that there were not two correctional officers on duty.  Id.  This conclusion would be supported by evidence indicating that timely cell-checks were done during the time that at least two correctional officers were present, suggesting that officers would have performed timely cell

checks on the overnight shift if staffing had been adequate.  Id., at 306 (noting the absence of evidence indicating that officers would have acted differently if more of them were on duty.)  It would likewise not be unreasonable to conclude that there was, or should have been, an objective awareness of the risk of harm even if there was no subjective awareness; while insufficient to establish individual liability, objective awareness can form the basis for municipal liability where a risk is obvious.

There is arguably a link between the Sheriff's policy and Wells' suicide, as he was left alone and unsupervised for almost eight hours.  The fact that no one else committed suicide during the time that the policy was in effect "simply shows that [the Sheriff] was fortunate, not that [he] wasn't deliberately indifferent."  Woodward, 368 F.3d at 929.  Where an existing, unconstitutional official policy attributable to a municipal policymaker itself causes injury, proof of a single incident is sufficient to support a finding of liability under Monell.  Armstrong, 152 F.3d at 578.  After careful consideration, the Court finds that while the causal link is somewhat tenuous, the record is sufficient to create a genuine issue of material fact with respect to whether Sheriff Thompson maintained a policy that sanctioned that maintenance of conditions that infringed upon the constitutional right of prisoners to reasonable safety during their detention.  Collignon, 163 F.3d at 988; Estate of Novack, 226 F.3d 530.  In other words, a jury must decide whether Sheriff Thompson's policy was "deliberately indifferent to [the] known or obvious consequences" of prohibiting correctional officers from observing or checking on detainees for up to eight hours or more at a time. Thomas, 604 F.3d at 303, citing Gable v. City of Chicago, 296 F.3d 531, 537 (7th Cir. 2002). Whether a jury will ultimately conclude that Sheriff Thompson was objectively aware of the risk created by the policy and failed to take appropriate steps to protect Wells is far from

clear, but based on the record before the Court, summary judgment must be denied on this issue.

Plaintiffs next assert that the Sheriff, as the final policymaker for the Jail, failed to identify, articulate, or enforce suicide prevention policies at the Jail and also failed to train, supervise, and discipline correctional officers on intake screening, monitoring detainees, and suicide prevention.  With respect to training, Sheriff Thompson asserts that the Jail provides training to its correctional officers as required by ICJ Standards.  This involves sending the officers to the state-mandated corrections training course conducted by the Illinois Police Training Institute ("PTI").  The training consists of a standard five-week course, which covers such areas as the ICJ Standards, detainee rights and privileges, processing and documentation of arrestees, classification and assignment of detainees, medical services, human behavior (including recognition of mental health problems and suicidal tendencies in detainees), suicide prevention, detention area safety and security, emergency procedures, and firearms training.  In addition to the PTI training, Defendants maintain that every correctional officer undergoes on-the-job training at the Jail, in which he or she works with an experienced correctional officer.  During the period of on-the-job training, a correctional officer is instructed by senior officers regarding Jail policies and procedures, including booking procedures, inmate classification, medical services, the Jail suicide policy, emergency procedures, cell checks, memo writing and record keeping.

ICJ Standards require the provision of annual training on suicide prevention and mental health issues to all jail officers, including the nature and symptoms of suicide, the specifics of identification of suicidal individuals through recognition of verbal and behavioral cues, situational stressors, evaluation of detainee coping skills and other signs of potential

risk, monitoring, evaluation, stabilization, and referral of suicidal individuals.  In 2005, Sheriff Thompson was specifically advised by IDOC inspectors of this requirement in § 701.10(a)(3) of the ICJ Standards.  However, there is evidence that this training did not occur on an annual basis.

Although there was no written policy, Sheriff Thompson asserts that the Jail policy was to comply with § 701.40(i)(2) of the ICJ Standards, which requires that when a detainee shows signs of or reports unusual physical or mental distress, he is to be referred to health care personnel as soon as possible.  The intake officer was to notify the Jail Superintendent, request a risk assessment of the arrestee by North Central Behavioral Health Systems, and document it on the Jail's pass-on log.  That being said, there is some evidence that there was no specified definition for what constituted "unusual mental stress" or any consistent practice for when to refer a detainee for a mental health evaluation.

Another apparently unwritten policy at the Jail was to comply with § 701.40(i)(3)(B) of the ICJ Standards, which required placing a detainee in a level of care that provided for his safety and stability when the detainee exhibited suicidal behavior or suicidal ideation. The intake officer was to place the arrestee in the Jail's observation cell, remove the arrestee's clothing, provide him with a suicide suit, place him on 15-minute checks until he was evaluated by a doctor or a mental health professional from North Central Behavioral Health Systems, notify the Jail Superintendent, and document the incident in the Jail's pass-on log.  There is again some evidence that this policy may not have always been followed, as there is testimony that at least one officer may have threatened this procedure to cause a detainee to disavow his suicidal ideation, and that it may not have been known to or understood by all of the correctional officers at the Jail.

On this record, Plaintiffs have failed to demonstrate that the Jail's training policies were unconstitutional in and of themselves.  *See* Estate of Novack, 226 F.3d at 528-32 (finding that policies requiring booking officers to use medical screening questionnaire to evaluate for suicide risk and take reasonable steps to ensure safety of detainees when a suicide risk is observed were constitutionally adequate.)  At best, they have identified violations of state regulations (which cannot in and of themselves form the basis for a § 1983 claim) and instances of non-compliance with the established policies.

Whereas a single occurrence of injury can be sufficient to support a finding of liability with respect to a claim that the injury was caused by an existing, unconstitutional municipal policy attributed to a municipal policymaker, the existence of only the single occurrence of injury is fatal to these claims alleging widespread, repeated failures to follow proper training procedures.  "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy." Armstrong, 152 F.3d at 578.  The need for evidence of prior incidents of injuries resulting from unconstitutional conduct is particularly important where correctional officers have attended the state's basic police training program, such as PTI.  *See* Palmquist v. Selvik, 111 F.3d 1332, 1244-46 (7th Cir. 1997).  While Plaintiffs have cited to several suicide attempts during Sheriff Thompson's tenure, and Sheriff Thompson stated in his deposition that he was aware of two or possibly three suicides, he was unable to identify whether they happened before or after Wells' death.  Plaintiffs simply have not shown that there was a pattern of suicides from which the inference could be drawn that Sheriff Thompson was aware that the Jail's policies for training, screening, or assessing mental health/suicide risks were constitutionally

inadequate and chose to do nothing to protect Wells in the face of this knowledge.  *See* Estate of Novack, 226 F.3d at 531.  Defendants are therefore entitled to summary judgment on this aspect of Plaintiff's official capacity claim.

II.      ADA Claim

Plaintiffs devote four paragraphs of their response to their argument that Bureau County and Sheriff Thompson violated Title II of the ADA and § 504 of the Rehabilitation Act[4] by failing and refusing to reasonably accommodate Wells' mental disabilities and to modify the Jail facilities, operations, services, accommodations, and programs to reasonably accommodate his disability.  Of these four paragraphs, the first paragraph is dedicated to establishing that the ADA can apply to state prisoners, which is essentially undisputed.  The second paragraph cites case law establishing that an ADA claim can be predicated on denying a prisoner access to prescribed medications and refusing to honor doctor ordered restrictions, failing to provide either program access to prisoners with mobility disabilities or auxiliary aids to prisoners with vision/hearing disabilities, and failing to provide ongoing treatment for diagnosed eye diseases.  No attempt is made to apply any of these cases to the facts of this case, where there is no evidence of a diagnosis of any disabling condition.  The third paragraph cites a Seventh Circuit case for the proposition that where an employee with a mental disability doesn't know how to ask for an accommodation, an employer should do what it can to help.  Again, no attempt is made to

---

[4]  Title II of the ADA was modeled after § 504 of the Rehabilitation Act.  The elements of claims under both statutes are nearly identical, and precedent under one statute generally applies to the other.  Washington v. Indiana High School Athletic Association, Inc., 181 F.3d 840, 845 n. 6 (7th Cir. 1999).  For purposes of this motion, any distinctions between the two statutes are irrelevant, and the Court will address the claim in the context of an ADA claim.

apply the case to the facts of this case or to establish that Wells in fact suffered from a mental disability within the meaning of the ADA. The fourth paragraph lists ways in which Wells could reasonably have been accommodated and summarily asserts that the fact that he committed suicide after being left alone and unobserved indicates that he was at least severely depressed.

With all due respect, this kind of perfunctory and undeveloped legal argument is utterly insufficient to survive a motion for summary judgment, and it is well-settled that responses of this type result in the waiver of the arguments. *See*, Finance Investment Co. v. Geberit AG, 165 F.3d 526, 1998 WL 890372, at *1 (7th Cir. Dec. 23, 1998) (finding a perfunctory and undeveloped argument to be waived); Volovsek v. Wisconsin Department of Agriculture, Trade and Consumer Protection, 344 F.3d 680, 689 n.6 (7th Cir. 2003); Indurante v. Local 705, International Brotherhood of Teamsters, 160 F.3d 364, 366 (7th Cir. 1998); Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 668 (7th Cir. 1998), cert. den., 119 S.Ct. 890 (1999). Accordingly, the Court finds that Plaintiffs have waived their ADA argument, and Defendants are therefore entitled to judgment as a matter of law on this claim.

Even assuming that Plaintiffs had not waived their ADA claim, it is otherwise without merit. In order to state a claim under Title II of the ADA, a plaintiff must show: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participating in, or denied the benefits of, a public entity's services, programs, or activities, or were otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was because of his disability. 42 U.S.C. § 12132; Kiman v. New Hampshire Dep't of Corrections, 451 F.3d 274. 283 (1st Cir. 2006). Where the claimed violation

involves a denial of an accommodation or modification, "the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request.'  This is because a person's 'disability and concomitant need for accommodation are not always known . . . until the [person] requests an accommodation.'"  Id., *citing* Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001).

Here, Plaintiffs assume, but make no effort to factually establish, that Wells was a qualified individual with a disability.  They suggest summarily that mental illness is a disability but have cited nothing in the record establishing that Wells had been diagnosed with or treated for mental illness at any time prior to his death.  In fact, when asked questions about his mental health during intake screening, the record indicates that Wells denied having any mental health issues.  Plaintiffs then make the bald assertion that depression alone can qualify as a disability if it substantially limits a major life activity such as breathing, interacting with others, or sleeping.  However, they again make no effort to point to factual evidence indicating that Wells actually suffered from depression or was substantially limited in any major life activity prior to his death.  Nor do Plaintiffs demonstrate a factual basis for finding that any request for accommodation or medical treatment was made or that the need for such treatment was obvious.

At summary judgment, a plaintiff cannot rest on conclusory allegations but rather must come forward with specific citations to evidence in the record supporting his claims. Fed.R.Civ.P. 56(e)(2); Maclin v. SBC Ameritech, 520 F.3d 781, 786 (7th Cir. 2008).  Failure to do so results in the entry of summary judgment on the merits of the claim in favor of the moving party.  Id.  Defendants are entitled to summary judgment on this basis, as well.

III.    <u>State Law Claims</u>

Plaintiffs assert state law claims of wrongful death, intentional infliction of emotional distress ("IIED"), conspiracy, respondeat superior, and a claim under the Local Government and Governmental Employees Tort Immunity Act.   The respondeat superior claim is effectively resolved by the above finding that none of the Defendants are individually liable, as well as immunity under § 2-204 of the Tort Immunity Act.  <u>Churchich</u>, 161 F.3d at 1045. Defendants are therefore entitled to summary judgment on Plaintiff's respondeat superior claim.  The remaining claims will be addressed in turn.

A.    Wrongful Death

Plaintiffs allege that the individual Defendants proximately caused Wells' death by neglect, default, and/or willful and wanton conduct in violation of the Illinois Wrongful Death Statute, 740 ILCS § 180/1.  This statute provides in relevant part:

> Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who or company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony.

740 ILCS § 180/1.

Defendants argue that there is no reason to reach the merits of this claim, as the Tort Immunity Act provides them with sufficient defenses and immunity pursuant to §§ 4-103,  2-201, 6-105, 6-106, and 4-105 of the Act.  Plaintiffs do not dispute the propriety of these defenses or immunities to conduct not rising to the level of willful and wanton.  With respect to willful and wanton conduct, Plaintiffs assert that such conduct does not enjoy

immunity under the Tort Immunity Act.  Even assuming that willful and wanton conduct is not entitled to the immunity afforded under the Act, Plaintiffs' wrongful death claim cannot survive.

As used in the Tort Immunity Act, willful and wanton conduct is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property."  745 ILCS 10/1-210.  To the extent that Plaintiffs' claim is based on willful and wanton conduct, the Seventh Circuit has held that "the standard for assessing whether conduct is willful and wanton is 'remarkably similar' to the deliberate indifference standard." Chapman v. Keltner, 241 F.3d 842, 847 (7ᵗʰ Cir. 2001), *citing* Churchich, 161 F.3d at 1041 n. 13; Williams v. Rodriguez, 509 F.3d 392, 404 (7ᵗʰ Cir. 2007).  Given the similarity of these standards, Defendants would be entitled to summary judgment in their individual capacities for the same reasons set forth in denying Plaintiffs' § 1983 claim against the individual defendants.  Id.

### B.    IIED

Plaintiffs allege that Defendants' conduct in failing to adequately care for Wells, failing to respond to his serious medical needs, and displaying deliberate indifference to his suffering were intended to inflict severe emotional distress upon him.  To state a claim for intentional infliction of emotional distress under Illinois common law, a plaintiff must show that:  (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress or knew there was a high probability that his conduct would cause severe emotional distress; and (3) the defendants' conduct did cause severe emotional distress.  *See* Lifton v. Board of Education of City of Chicago, 416 F.3d 571, 579

(7th Cir. 2005); <u>Van Stan v. Fancy Colours & Co.</u>, 125 F.3d 563, 567 (7th Cir. 1997); <u>Doe v. Calumet City</u>, 641 N.E.2d 498, 506 (Ill. 1994); <u>McGrath v. Fahey</u>, 533 N.E.2d 806, 809 (Ill. 1988).  Conduct is extreme and outrageous only if "the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency . . . ."  <u>Public Finance Corp. v. Davis</u>, 360 N.E.2d 765, 767 (Ill. 1976); <u>Kolegas v. Heftel Broad. Corp.</u>, 607 N.E.2d 201, 211 (Ill. 1992); <u>Cook v. Winfrey</u>, 141 F.3d 322, 331 (7th Cir. 1998).  Moreover, "as to the third prong, an action may lie 'only where the distress inflicted is so severe that no reasonable man could be expected to endure it.'" *See* <u>McNamara v. Guinn</u>, 2000 WL 1222128, at *3-4 (N.D.Ill. August 23, 2000), *citing* <u>McGrath</u>, 533 N.E.2d at 809.

The Court has previously found that the individual Defendants were not deliberately indifferent in their conduct toward Wells.  The record does not support the reasonable conclusion that the individual Defendants intentionally failed to provide adequate medical/ mental health care to Wells or refuse to respond to any known or obvious crisis.  Under the facts of this case, the Court concludes that Plaintiffs' failure to establish an adequate factual basis to support a finding of deliberate indifference or willful and wanton conduct on their § 1983 claim necessarily precludes them from making an adequate showing of extreme and outrageous conduct or that any individual defendant intentionally or recklessly caused severe emotional distress as a matter of law.  Defendants are therefore entitled to summary judgment on the IIED claim.

### C.    Conspiracy

Plaintiffs allege that Defendants reached an understanding and engaged in a course of conduct conspiring between themselves to deliberately deny Wells necessary care, as

well as to cover up their own misconduct.  Specifically, Plaintiffs maintain that Defendants conspired when they failed to conduct a proper intake screening, monitor or document adverse court outcomes, observe or detect his activities of self-harm, immediately respond with life saving measures, preserve evidence including a video of Wells' behavior, and accurately report the events leading up to and following his death.  They further assert that Keefer and Spiegel reached an agreement with Thompson's express directive that they would not follow the requirements of the ICJ Standards and personally observe detainees every 30 minutes.

Initially, Plaintiffs fail to recognize the immunities afforded to Defendants under the Tort Immunity Act as set forth in the discussion of the wrongful death claim.  Furthermore, civil conspiracy requires a showing of:

> (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in furtherance of which one of the conspirators committed an overt tortious or unlawful act.

Fritz v. Johnson, 209 Ill.2d 302, 317 (Ill. 2004).  In this respect, Plaintiffs have utterly failed to meet their burden, as their argument consists largely of conclusory allegations and citations to law without any real effort to identify a factual basis for the claim.  At summary judgment, a plaintiff cannot rest merely on allegations and conclusions, but rather must come forward with specific citations to evidence in the record supporting his claims.  Fed.R.Civ.P. 56(e)(2); Maclin, 520 F.3d at 786.  Failure to do so results in the entry of summary judgment on the merits of the claim in favor of the moving party.  Id.  Defendants are entitled to summary judgment on this basis, as well.

D.     Tort Immunity Act

Finally, Plaintiffs argue that Bureau County, as the local government entity responsible for funding the Sheriff's Office, must pay any tort judgment or settlement for compensatory damages for which it or an employee acting within the scope of his employment is liable pursuant to § 9-102 of the Tort Immunity Act.  Having concluded that an official capacity claim against Sheriff Thompson remains for trial, Bureau County remains a necessary defendant in this case for purposes of indemnification pursuant to Carver, 324 F.3d at 948.  To the extent that Defendants seek summary judgment in this respect, their request must be denied.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment [#28] is GRANTED IN PART and DENIED IN PART.  The Motion is denied with respect to the claim against Sheriff Thompson in his official capacity for his policy regarding cell checks and claim against Bureau County for indemnification of any judgment entered against the Sheriff, and granted in all other respects.  Defendants Keefer, Spiegel, and Thompson are terminated in their individual capacities, and this matter remains set for final pretrial conference on July 29, 2010, at 1:00pm.

ENTERED this 2nd day of July, 2010.

s/ Michael M. Mihm
Michael M. Mihm
United States District Judge